UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 18 CR 743 |
| v. ) | |
| ) | Hon. John Z. Lee |
| KOREY ISBELL ) | |

**UNITED STATES' OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT AND POSITION PAPER AS TO SENTENCING FACTORS**

Defendant Korey Isbell participated in an elaborate scheme to defraud the Illinois Department of Employment Security ("IDES") of millions of dollars in unemployment insurance benefits. Although defendant was by no means the mastermind of the scheme or benefitted to the extent of other defendants, his role – providing addresses to which fraudulent cards could be sent and withdrawing funds using fraudulently obtained IDES debit cards – was still critical to the overall operation. Accordingly, a sentence of imprisonment within the Guidelines range is appropriate. The defendant should also be ordered to pay restitution in the amount of $64,242, which is the amount of actual loss associated with this defendant, and he should serve a term of three years' of supervised release to ensure his successful and law-abiding return to the community.

**I. OFFENSE CONDUCT**

Defendant has pleaded guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343, related to a larger scheme to defraud involving multiple defendants. While the objectives of the fraud scheme was simple – to steal money from IDES using

1

false identification information – the means by which the co-schemers achieved that objective was complex. Each defendant played a critical role in the scheme: Ashley Weathersby stole the personal identifying information from her employer, Southwest Gastroenterology, and sold that information to defendants Brandon Pitts, Corey Logsdon and Angelo Steele. Pitts, Logsdon and Steele used the information to file fraudulent claims for benefits, and directed IDES to send debit cards to various addresses in Chicago and elsewhere. Defendant Isbell, like defendant Yoshimi Henry, provided some of the addresses that Pitts and Logsdon would use in the fraudulent claims, and to which IDES would direct the IDES debit cards. Defendant retrieved the debit cards from the addresses he provided and used other cards at ATMs in Chicago and elsewhere to withdraw cash, cash that they knew they was not theirs, which was obtained fraudulently and which they used for their own benefit.

Defendant Isbell specifically provided at least seven residential addresses to Logsdon in exchange for money. Those addresses are listed on the spreadsheet attached as Exhibit A to the Government's Version of the Offense ("Exhibit A"). Defendant has also admitted that Logsdon used those addresses when he filed fraudulent IDES claims and IDES sent fraudulently obtained debit cards to those addresses. The actual amount paid by IDES with respect to cards sent to those addresses was $12,247. The amount that IDES could have paid out on the fraudulent claims, but for some intervening event stopping those payments, was $114,816.

Defendant has also admitted to retrieving at least eight fraudulently obtained debit cards from the addresses he provided to Logsdon. Defendant used other IDES

2

debit cards that Logsdon gave him to obtain cash from ATMs. Six of those cards, and the losses associated with each of them, are included in Exhibit A in the section marked "ATM." In total, $51,955 of stolen IDES funds was withdrawn using those cards. Defendant knew that he was not entitled to the cards that he used to withdraw the fraudulently obtained funds, or the funds that he withdrew from the ATM machines using those cards. Defendant used the fraudulently obtained IDES funds for his own purpose and benefit.

In total, defendant and his co-schemers filed and caused to be filed false and fraudulent unemployment insurance claims in the names of, and using the personal identification information of, at least 892 individuals, resulting in intended loss to IDES of approximately $8.8 million in unemployment benefits and actual loss to IDES totaling approximately $1.5 million in unemployment benefits. As set forth in Exhibit A, defendant himself is associated with approximately $179,764 of those intended losses.

## II. THE PSR GUIDELINE RANGE

The Government disagrees with one aspect of Probation's Presentence Report Guideline range calculation. Probation asserts that a two level "minor role" decrease in the offense level is appropriate under Guideline § 3B1.2(b). To qualify for any reduction under § 3B1.2 and Application Note 3, defendant must demonstrate that he was "substantially less culpable" than the average participant in the scheme. *United States v. Thi*, 692 F.3d 571, 574 (7th Cir. 2012); *United States v. Leiskunas,* 656 F.3d 732, 739 (7th Cir. 2011); *United States v. Sorich,* 523 F.3d 702, 717 (7th Cir. 2008). It is the defendant's burden to show by a preponderance of the evidence that

he was substantially less culpable than other participants with respect to the crime to which he has pleaded guilty, not to other charges against other defendants. *See* U.S.S.G. § 3B1.2, comment. (n.3); *United States v. Corral*, 324 F.3d 866, 874 (7th Cir. 2003). Moreover, "where each person was an 'essential component' in the conspiracy, the fact that other members of the conspiracy were more involved does not entitle a defendant to a reduction in the offense level." *United States v. McKee,* 389 F.3d 697, 700 (7th Cir. 2004) (citing *United States v. Castillo,* 148 F.3d 770 (1998)). Sentencing courts apply this reduction infrequently. *See Corral*, 324 F.3d at 874.

Here, while there is no evidence that Isbell was a leader or organizer of the scheme, he was not "substantially less culpable" than the average participant. Isbell was an "essential component" of the scheme in multiple ways. He not only provided addresses to Logsdon that were then used to apply for fraudulent IDES debit cards, but he also picked up IDES envelopes containing those credit cards from those addresses and, on multiple occasions, used the credit cards at ATM machines to obtain stolen IDES funds. On one occasion, for example, Isbell can be seen in ATM security video footage using four cards in the names of four different people, one right after the other. Defendant did not simply participate by withdrawing cash on one or two occasions at the request of someone else, or provide a few addresses to others as a way to further the fraud, similar to a one-time narcotics courier. Rather, defendant was involved in multiple parts of the scheme, much like several of the other participants.

Defendant was at least as culpable, for example, as his co-schemers Kewan Watts and Yoshimi Henry, who similarly provided addresses to Pitts and Logsdon, and, like Watts, withdrew money using fraudulently obtained cards. Moreover, the fact that defendant is being held accountable for only a small portion of the overall loss, that is reflected in his adjustment under Guideline § 2B1.1(b)(1), for which he receives a smaller increase in offense level than other participants in the scheme. A minor role adjustment based on the loss amount that is provable against him is therefore unnecessary to account for his role in the scheme. Accordingly, defendant is not entitled to a minor role adjustment.

Based on the facts known to the government, the following is the appropriate Guidelines calculation:

- The base offense level for each count is 7, pursuant to Guideline § 2B1.1(a)(1).

- The offense level is increased by 10 levels pursuant to Guideline § 2B1.1(b)(1)(f) because the intended loss attributable to the defendant is approximately $179,764, which is more than $150,000 but less than $250,000.

- Pursuant to Guideline § 2B1.1(b)(2)(A)(i), the offense level is increased by 2 levels because the offense involved 10 or more victims.

- Pursuant to Guideline § 2B1.1(b)(11)(C)(ii), the offense level is increased by 2 levels because the offense involved the possession of five or more means of identification that unlawfully were obtained by the use of another means of identification.

- Defendant receives a three level adjustment for acceptance of responsibility.

Defendant's total offense level is therefore 18. With a criminal history category II, defendant's resulting Guidelines range is 30 to 37 months' imprisonment.

**III. A SENTENCE WITHIN THE GUIDELINES RANGE IS APPROPRIATE**

Criminal sentencing has four purposes – retribution, deterrence, incapacitation, and rehabilitation. *United States v. Milbourn*, 600 F.3d 808, 812 (7th Cir. 2010). Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing. In order to determine the particular sentence to impose, the Court must consider the familiar statutory factors listed in § 3553(a)(1)-(7). One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Commission's policy statements. *See* § 3553(a)(4), (a)(5). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 522 U.S. 38, 128 S. Ct. 586, 596 (2007). For two reasons, this Court should give serious consideration to the advisory Guidelines range.

*First*, the Sentencing Guidelines are the sole factor in § 3553(a) that provides any objective sentencing range that can practicably promote the overall goal of minimizing unwarranted sentencing disparities, which is itself a statutorily-mandated factor, § 3553(a)(6). *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country."); *see also Booker v. United States*, 543 U.S. 220, 250 (2005) ("Congress' basic statutory goal – a system that diminishes sentencing disparity"); *id.* at 253 ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity"); *id.* at 267 (rejecting other remedial alternatives because they were inconsistent with the

6

"basic objective of promoting uniformity in sentencing"). The Supreme Court created the advisory system to "continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individual sentences where necessary." *Booker*, 543 U.S. at 264-65. The only way to prevent widespread unwarranted disparities is to give serious weight to the Guidelines.

*Second*, the Guidelines deserve meaningful consideration because they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 128 S. Ct. at 594. It is true that there is no "presumption" that a Guidelines sentence is the "correct" sentence, *Rita v. United States*, 551 U.S. 338, 351 (2007), and that there is "broad" sentencing discretion post-*Booker*. *United States v. Demaree*, 459 F.3d 791, 794-95 (7th Cir. 2006). However, the Commission is "a respected public body with access to the best knowledge and practices of penology; its judgments should not lightly be disregarded." *United States v. Wachowiak*, 496 F.3d 744, 753 (7th Cir. 2007) (internal quotation and citation omitted). Furthermore, the Commission is charged by statute to periodically review and revise the Guidelines as the Commission collects comments and data from numerous sources in the criminal justice system. *See* 28 U.S.C. § 994(o). These ongoing efforts to refine the Guidelines are another reason to seriously consider the advisory range.

Here, a careful consideration of the § 3553(a) factors weighs in favor of a sentence within the advisory Guidelines range.

Case: 1:18-cr-00743 Document #: 239 Filed: 07/14/20 Page 8 of 16 PageID #:571

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant Warrant a Sentence Within the Guidelines Range

#### 1. Nature and Circumstances of the Offense

The nature and circumstances of the offense are very serious for at least two reasons. *First*, the scheme – and defendant's role in it – involved fraudulently obtaining IDES funds, money that was intended to support individuals in Illinois who were unemployed and needed IDES assistance to replace lost income. Fraud on IDES diverts money from legitimate claimants – people who have lost their jobs – to people, like defendant, who have no legitimate claim to the funds. Ultimately, that fraud adds significant costs for IDES and Illinois taxpayers, and impacts the operation of the entire system of unemployment benefits. *See "United States v. Wilson*, 960 F.2d 48, 50–51 (7th Cir. 1992) ("Prosecuting those who defraud state unemployment compensation programs is an important means for protecting the government's investment by ensuring that those programs are run with a minimum of waste and fraud.")[1]

*Second*, and equally as importantly, defendant knowingly participated in a scheme to defraud IDES using the names and information of unsuspecting identity theft victims. Defendant knew this because he provided addresses to his co-schemer Logsdon, and then would retrieve fraudulently obtained IDES cards in the names of people he did not know from those addresses. He also used IDES debit cards in the

---

[1] The government intends to introduce prior to sentencing a victim impact statement from IDES setting forth the harm of fraudulent schemes like the one at issue in this case to IDES and Illinois taxpayers generally.

8

names of multiple people he did not know to withdraw funds from ATM machines. Defendant knew, or reasonably should have known, that those names were the names of real people whose identities were stolen in order to allow him and his co-schemers to fraudulently obtain significant amounts of cash.

Defendant's claim that his offense was less serious than the Guidelines calculation provides because the Guidelines rely on intended rather than actual losses should be disregarded. Application Note 3(A) to Guideline 2B1.1(b)(1) states that "loss" is the "greater of actual loss or intended loss." *See United States v. Middlebrook*, 553 F.3d 572, 578 (7th Cir. 2009). "When the intended loss exceeds the actual loss, the district court uses the intended loss in calculating the defendant's sentence." *Id.*; *see also United States v. Kennedy*, No. 12 CR 284, 2014 WL 2742798, at *7 (N.D. Ill. June 12, 2014) ("Kennedy's loss amount is properly calculated by taking the intended loss for all claims attributable to her.") The use of intended loss does not, therefore, "overstate" the losses attributable to defendant or give any reason to depart from the Guidelines calculation. Indeed, defendant could have been sentenced under a loss calculation that included the intended losses attributable to the losses of the entire scheme, which exceeded $8 million. Using the intended loss calculation that was reasonable foreseeable to defendant (based on the government's evidence) is a reasonable way to establish a Guidelines sentence.

Defendant's conduct was very serious, and demands a serious sentence. Defendant's offense was a crime not only of greed, but of deception and the callous disregard of consequences that could result to individuals and an entire system

established to assist people in the community. Accordingly, the seriousness of the offense demands a Guidelines sentence.

### 2. Defendant's History and Characteristics

The Court is also required to consider, under 18 U.S.C. § 3553(a), the defendant's history and characteristics. According to the PSR, defendant appears to have had a close relationship with his family and a relatively stable upbringing, despite his father's absence when defendant was seven. PSR ¶¶ 60-61. He also continues to have the support of his family during the pendency of this case. *Id.* ¶ 62-63. There does not appear to be anything in defendant's background that would indicate he was forced or coerced to commit this crime, nor is there any indication that he engaged in the scheme out of desperation or extreme financial distress.

In addition, after defendant committed the crimes in this case, he was charged and convicted of a similar crime in Lake County, Indiana, in 2016. There, defendant used fake identification of someone else to attempt to open a Best Buy account. He was charged and pleaded guilty to using that false identification and sentenced to a one-year suspended sentence. This separate charge is significant because it indicates that defendant's participation in the scheme in this case was not the only time he has participated in fraud, and identity-theft related fraud in particular, and therefore a sentence must attempt to deter defendant's use of deception for his own financial gain.

### B. The Need for a Guideline Sentence

In addition to evaluating the nature of offense and the history and characteristics of the defendant, section 3553(a)(2)(A)-(C) requires that a sentence

"reflect the seriousness of the offense," "promote respect for the law," "provide just punishment for the offense," "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." Here, a sentence within the applicable Guidelines range is necessary under section 3553(a) because anything less will denigrate the seriousness of defendant's offenses, will not promote respect for the law by defendant or other would-be offenders, will not provide just punishment for the offenses, and will not protect the public from further crimes by the defendant.

The advisory Guidelines range in this case is lengthy. However, defendant participated in a massive fraud on IDES; had this fraud not been discovered by law enforcement, it likely would have continued indefinitely, harming more and more individuals and the IDES unemployment benefit system. Without a significant sentence, defendant himself and others like defendant will fail to appreciate the harm this type of crime causes to institutions and individuals, and will continue to see the allure of "easy" fraudulently obtained money. A Guideline sentence will promote respect for the law and provide just punishment for the offense.

There are no mitigating factors pointing toward a below Guidelines sentence. The defendant committed these offenses knowingly, without any obvious regard for their consequences. As discussed above, defendant was not forced into the conduct by anyone, he does not appear to have limitations on his ability to lead a productive life within the rules of the law, and he should have understood the serious consequences of his actions. His conduct here has no excuse, and there is no reason to depart downward from the Guidelines.

IV. **PROPOSED CONDITIONS OF SUPERVISED RELEASE**

Consistent with the Seventh Circuit's guidance in *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), the United States recommends a term of supervised release of three years with certain conditions imposed to ease the transition back into the community. The government sets forth below the justifications for the proposed conditions of defendant's supervised release. *See, e.g.*, *United States v. Siegel*, 753 F.3d 705, 717 (7th Cir. 2014) (vacating supervised release conditions because the conditions were "inappropriate, inadequately defined, or imposed without the sentencing judge's having justified them by reference to the sentencing factors in 18 U.S.C. § 3553(a)").

### A. Proposed Mandatory Conditions of Supervised Release

The following conditions are required by law:

1. The defendant shall not commit another federal, state or local offense. *See* 18 U.S.C. § 3583(d); U.S.S.G. § 5D1.3(a)(1).

2. The defendant shall not unlawfully possess a controlled substance. *See* 18 U.S.C. § 3583(d); U.S.S.G. § 5D1.3(a)(2).

3. The defendant shall submit to the collection of a DNA sample at the direction of the U.S. Probation Office if the collection of such a sample is authorized pursuant to Title 42, United States Code, Section 14135a(a). *See* 8 U.S.C. § 3583(d); U.S.S.G. § 5D1.3(a)(8).

4. The defendant shall pay a $100 special assessment. 18 U.S.C. § 3013; U.S.S.G. § 5D1.3(a)(6).

B.  **Proposed Discretionary Conditions of Supervised Release**

The following conditions support defendant's rehabilitation and reintegration into the community, and ensure that he is engaged in lawful pursuits rather than criminal activity:

5.  The defendant shall provide financial support to any dependents if financially able to do so.

6.  The defendant shall seek, and work conscientiously at, a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons. *See* U.S.S.G. § 5D1.3(c)(7).

7.  The defendant shall not knowingly meet or communicate with any person he knows to be engaged in, or planning to be engaged in, criminal activity.

8.  The defendant shall refrain from the excessive use of alcohol.

9.  The defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon. *See* U.S.S.G. § 5D1.3(c)(10); 18 U.S.C. § 922(g).

The following conditions are intended to facilitate the probation officer's supervision of the defendant, which is important to promote the defendant's respect for the law and to deter the defendant from committing future crimes:

10. The defendant shall not knowingly leave the judicial district in which he is being supervised without the permission of the court or the probation officer. *See* U.S.S.G. § 5D1.3(c)(3).

11. The defendant shall report to the probation officer as directed by the probation officer. *See* U.S.S.G. § 5D1.3(c)(2).

12. The defendant shall permit the probation officer to visit his home or elsewhere at any reasonable time, and permit confiscation of any contraband observed in plain view of the probation officer. *See* U.S.S.G. § 5D1.3(c)(6).

13. The defendant shall notify the probation officer within 72 hours of any change in his residence, employer, or workplace. *See* U.S.S.G. § 5D1.3(c)(5).

14. The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer. *See* U.S.S.G. § 5D1.3(c)(9).

### C. Proposed Special Conditions of Supervised Release

The following conditions are intended to help the defendant transition into the community and to ensure compliance with the conditions of supervised release:

15. If unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, defendant shall perform at least 20 hours of community service per week at the direction of the U.S. Probation Office until gainfully employed. U.S.S.G. § 5D1.3(e)(3).

16. Defendant shall not maintain employment where he has access to other individual's personal information, including Social Security numbers and credit card numbers unless approved by a Probation officer.

17. Defendant shall pay any financial penalty that is imposed by the Court that remains unpaid at the commencement of the term of supervised release. A monthly payment schedule shall be an amount that is at least 10% of defendant's net monthly income, defined as income net of reasonable expenses for basic necessities such as food, shelter, utilities, insurance and employment-related expenses.

18. Defendant shall not incur new credit card charges or open additional lines of credit without the approval of a Probation officer unless he is in compliance with the financial obligations imposed by the Court's judgment.

19. Defendant shall provide a Probation officer with access to any requested financial information necessary to monitor compliance with conditions of supervised release.

20. Defendant shall notify the Court of any material change in his economic circumstances that might affect his ability to pay restitution, fines or special assessments.

21. The defendant shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court. U.S.S.G. § 5D1.3(c)(11).

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant within the Guidelines range, order defendant to pay restitution of $64,242, and order a three-year period of supervised release consistent with the goals of criminal punishment.

                                        Respectfully Submitted,

                                        JOHN R. LAUSCH, JR.
                                        UNITED STATES ATTORNEY

By:    /s/ *Matthew L. Kutcher*
           MATTHEW L. KUTCHER
           Assistant United States Attorney
           United States Attorney's Office
           219 South Dearborn Street
           Chicago, Illinois 60604
           (312) 469-6132

Dated: July 14, 2020